# In the
# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 02-3627, 03-2281 & 03-2951

CYDNEY A. CRUE, JOHN M. MCKINN,
DEBBIE A. REESE, BRENDA M. FARNELL,
FREDERICK E. HOXIE, STEPHEN KAUFMAN,
and PHILIP W. PHILLIPS,

*Plaintiffs-Appellees*,

v.

MICHAEL AIKEN,

*Defendant-Appellant.*

---

Appeals from the United States District Court
for the Central District of Illinois.
No. 01 C 1144—**Michael M. Mihm**, *Judge.*

---

ARGUED FEBRUARY 9, 2004—DECIDED JUNE 1, 2004

---

Before BAUER, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* This case, raising First Amendment issues involving the University of Illinois, concerns "Chief Illiniwek," who, depending on one's point of view, is either a mascot or a symbol of the university. More on this distinction later but first, before getting to the issue at hand, we detour for a brief look at college nicknames and their embodiment as mascots.

In the Seventh Circuit, some large schools—Wisconsin (Badgers), Purdue (Boilermakers), Indiana (Hoosiers), Notre Dame (The Fighting Irish), DePaul (the Blue Demons), the University of Evansville (Purple Aces), and Southern Illinois (Salukis)—have nicknames that would make any list of ones that are pretty cool. And small schools in this circuit are no slouches in the cool nickname department. One would have a hard time beating the Hustlin' Quakers of Earlham College (Richmond, Indiana), the Little Giants of Wabash College (Crawfordsville, Indiana), the Mastodons of Indiana University-Purdue University-Fort Wayne (Fort Wayne, Indiana), and the Scarlet Hawks of the Illinois Institute of Technology.

But most schools have mundane nicknames. How can one feel unique when your school's nickname is Tigers (43 different colleges or universities),[1] Bulldogs (40 schools), Wildcats (33), Lions (32), Pioneers (31), Panthers or Cougars (30 each), Crusaders (28), or Knights (25)? Or how about Eagles (56 schools)? The mascots for these schools, who we assume do their best to fire up the home crowd, are pretty generic—and pretty boring.

Some schools adorn their nicknames with adjectives—like "Golden," for instance. Thus, we see Golden Bears, Golden Bobcats, Golden Buffaloes, Golden Bulls, Golden Eagles (15 of them alone!), Golden Flashes, Golden Flyers, Golden Gophers, Golden Griffins, Golden Grizzlies, Golden Gusties, Golden Hurricanes, Golden Knights, Golden Lions, Golden Panthers, Golden Rams, Golden Seals, Golden Suns, Golden Tigers, and Golden Tornados cheering on their teams.

All this makes it quite obvious that, when considering college nicknames, one must kiss a lot of frogs to get a

---

[1] See list compiled by Adam Joshua Smargon at *www.smargon.net/nicknames.*

prince. But there are a few princes. For major universities, one would be hard pressed to beat gems like The Crimson Tide (Alabama), Razorbacks (Arkansas), Billikens[2] (St. Louis), Horned Frogs (TCU), and Tarheels (North Carolina). But as we see it, some small schools take the cake when it comes to nickname ingenuity. Can anyone top the Anteaters of the University of California-Irvine; the Hardrockers of the South Dakota School of Mines and Technology in Rapid City; the Humpback Whales of the University of Alaska-Southeast; the Judges (we are particularly partial to this one) of Brandeis University; the Poets of Whittier College; the Stormy Petrels of Oglethorpe University in Atlanta; the Zips of the University of Akron; or the Vixens (will this nickname be changed if the school goes coed?) of Sweet Briar College in Virginia? As wonderful as all these are, however, we give the best college nickname nod to the University of California-Santa Cruz. Imagine the fear in the hearts of opponents who travel there to face the imaginatively named "Banana Slugs"?[3]

From this brief overview of school nicknames, we can see that they cover a lot of territory, from the very clever to the rather unimaginative. But one thing is fairly clear—although most are not at all controversial, some are. Even the Banana Slug was born out of controversy. For many

---

[2]  What in the world *is* a "Billiken"?

[3]  As evidence of the Banana Slug's uniqueness, we offer this: of all the nicknames to choose from, acclaimed film director Quentin Tarantino selected it to appear in one of the memorable scenes of his 1994 classic, "Pulp Fiction." Although the movie includes scores of unique scenes (film critic Roger Ebert gushes over it in his 2002 book, *The Great Movies*), it was certainly shocking to see stone-cold killer Vincent Vega (John Travolta) wearing a Banana Slug T-shirt after being "cleansed" at the end of the picture (but not the end of the story—you have to see it to grasp the distinction).

years, a banana slug (ariolomax dolichophalus to the work of science) was only the unofficial mascot at UC-Santa Cruz.[4] In 1981, the chancellor named the "Sea Lion" as the school's official mascot. But some students would have none of that. Arguing that the slug represented some of the strongest elements of the campus, like flexibility and nonagressiveness, the students pushed for and funded a referendum which resulted in a landslide win for the Banana Slug over the Sea Lion. And so it became the official mascot.

Not all mascot controversies are "fought" out as simply as was the dispute over the Banana Slug. Which brings us to the University of Illinois where its nickname is the "Fighting Illini," a reference to a loose confederation of Algonquin Indian Tribes that inhabited the upper Mississippi Valley area when French explorers first journeyed there from Canada in the early seventeenth century. The university's mascot, to mirror its nickname—or to some its symbol—is "Chief Illiniwek." Chief Illiniwek *is* controversial. And the controversy remains unresolved today.

Chief Illiniwek does not participate in traditional cheerleading activities, but he does "perform" at athletic events. Whether his presence, and what he does, makes him more mascot than symbol, or vice versa, is really for others to decide. Suffice to say that opponents consider him to be a mascot, while supporters often refer to him as a symbol. The "debate," however, over the use of Native-American names whether as logos, mascots, or symbols is not unique to the University of Illinois.

Forty years ago, Marquette University used a mascot named "Willie Wampum"—a crude Indian caricature with a huge papier-mâché head (about 4 feet high!)—to whip up the crowd at its basketball games in support of its nick-

---

[4] See slug.web.com.

name—Warriors. Marquette is now the Golden Eagles. Similarly, the Stanford Indians became the "Cardinal," St. John's transformed from "Red Men" to "Red Storm," Miami of Ohio moved from "Redskins" to "Redhawks," and Eastern Michigan went from "Hurons" to "Eagles." Some schools, most notably Florida State ("Seminoles") and the University of North Dakota[5] (the Fighting Sioux), have resisted change. And so has the University of Illinois.

Chief Illiniwek traces his existence to 1926 when, according to the University of Illinois web site, as assistant band director "conceived the idea of having a Native American war dance performed at halftime at the Illinois-Pennsylvania game." A student, wearing "a homemade costume complete with a war bonnet made of turkey feathers," performed a dance at halftime, which "was a big hit." According to *NCAA News* (April 23, 2001), the student mascot also smoked a "peace pipe" at halftime with Pennsylvania's mascot, "William Penn."

From the home page of the UIUC web site, we are informed as to how the chief was named:

> The expression "Illiniwek" was first used in conjunction with the University of Illinois by football coach Bob Zuppke in the mid 1920's. Zup was a philosopher and historian by training and inclination, and he was

---

[5] It's quite possible that the University of North Dakota is still the "Fighting Sioux" because its $100 million ice hockey arena, which was under construction in 2000, depended on it. According to the April 23, 2001, edition of *NCAA News*, "News & Features," a hot debate over the school's nickname was brewing in Grand Forks when a wealthy alumnus—who contributed $35 million to the ice hockey arena—threatened to close the project down if the "Fighting Sioux" nickname and related logo were retired. The North Dakota State Board of Higher Education subsequently voted to keep the status quo.

intrigued by the concept the Illini peoples held about their identity and aspirations. They spoke a dialect of the Algonquin language and used the term "Illiniwek" to refer to the complete human being—the strong, agile human body; the unfettered human intellect; the in-domitable human spirit.

Chief Illiniwek's "costume" underwent several revisions before settling on its present incarnation in 1982. Similarly, the chief's dance, involving intricate footwork and fast, spinning movements with split jumps and high kicks, has changed over the years. While these changes were taking place, some opposition to the presence of the chief began to percolate around Urbana-Champaign, beginning around 1975.

The earliest signs of protest we could find appear in the university's 1975 yearbook, where this appears:

### A CHALLENGE TO THE CHIEF

Chief Illiniwek has been hailed as a symbol of University spirit since 1926. But while thousands have cheered his acrobatic gyrations during halftime, others look upon him with disgust.

"Chief Illiniwek is a mockery not only of Indian customs but also of white people's culture," said Bonnie Fultz, Citizens for the American Indian Movement (AIM) executive board member. According to Fultz, the continued use of Indian history as entertainment degrades the Indian and disgraces the white race by revealing an ignorance of tribal cultures.

"The Illiniwek exhibition is tantamount to someone putting on a parody of a Catholic Mass," Norma Linton, Citizens for AIM member and visiting anthropology lec-turer at the University said. She continued by saying that Chief Illiniwek is an inaccurate composite.

"The Indians within the Illinois area are of a different tribal culture. The idea of symbols from several different tribes mashed together angers Indians," she added. "They do not want their individual tribal customs combined and distorted, but want their traditions to remain separate and unique."

Mike Gonzalez, the current Chief, said that the only requirement in being considered for the position is an eagle spread jump. However, Gonzalez felt that Illiniwek is "majestic" and a symbol of fighting spirit. "In no way does it degrade the American Indian," Gonzalez said. "I think Illiniwek honors the Indian."

John Bitzer, Illiniwek from 1970-73, also defended the role. "Other university mascots are just caricatures but Illiniwek portrays the Indians as they would want to be portrayed."

Rep. A. Webber Borchers, R-Decatur, the originator of the costume while a student at the University, also spoke in defense of Chief Illiniwek. "It's the most outstanding tradition of any university in the land, with no intention of disrespect to the Indians," he said.

University officials have sensed the Chief Illiniwek controversy. The symbol of Chief Illiniwek was removed from University stationary this year to appease AIM. Everett Kissinger, coordinator of Chief Illiniwek and marching band director, was indignant about the controversy. "Illiniwek has been a tradition here since 1926, and I don't want you people (reporters) opening up a lot of problems about it," he said. Kissinger in turn has ordered Gonzalez to avoid radio interviews and large-scale publicity about his role as Chief.

The first sounds of protest over Chief Illiniwek in 1975 have grown to a crescendo. Many people today find him to be offensive, including the Peoria Tribe of Indians of Oklahoma, known collectively as the Illiniwek or Illinois

Nations, who just a few years ago formally voted to ask the university to stop using him as a mascot. And that takes us to today's suit where a loose group of faculty members and a graduate teaching assistant[6] at the university escalated the debate a little further. The group, whom we will simply call "plaintiffs," claim that the chief creates a hostile environment for Native American students and that he promotes dissemination of inaccurate information in an educational setting. They have expressed their opposition to Chief Illiniwek through public speeches, letter writing, meetings with student groups, and by submitting newspaper articles for publication. They have also attended meetings protesting what they term is his use as a mascot. The university has not interfered with any of these activities.

It was not until the plaintiffs expressed interest in contacting prospective student-athletes about the controversy surrounding Chief Illiniwek that the university began to frown on their activities. The university was alerted to their activities by a press account on February 28, 2001, wherein some plaintiffs made known their intention to contact prospective student-athletes and inform them of the Chief Illiniwek controversy and the implications of competing athletically on behalf of a university which they said employs racial stereotypes. That got the university's attention.

Vincent Ille, the assistant director of athletics, asked the membership services coordinator of the National Collegiate Athletics Association (NCAA) whether NCAA rules applied to contacts by faculty members with prospective student-athletes.

---

[6] The teaching assistant, Cydney Crue, identifies herself as a student; defendant Aiken claims she is a faculty member. For purposes of this decision, it is not necessary for us to decide this issue of university politics.

Two days later, on March 2, 2001, the chancellor of the university, defendant Michael Aiken, sent the e-mail which precipitated this lawsuit. It said:

> Questions and concerns have been raised recently about potential contacts by employees, students or others associated with the University with student athletes who are being recruited by the University of Illinois. As a member of the National Collegiate Athletics Association (NCAA) and the Big Ten Athletic Conference, there are a number of rules with which all persons associated with the University must comply. For example, the NCAA regulates the timing, nature and frequency of contacts between any University employee and prospective athletes. It is the responsibility of the coaches and administration in the Division of Intercollegiate Athletics to recruit the best student athletes to participate in varsity sports at the University of Illinois. No contacts are permitted with prospective student athletes, including high school and junior college students, by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee.

> The University faces potentially serious sanctions for violation of NCAA or Big Ten rules. All members of the University community are expected to abide by these rules, and certainly any intentional violations will not be condoned. It is the responsibility of each member of the University to ensure that all students, employees and others associated with the University conduct themselves in a sportsmanlike manner. Questions about the rules should be addressed to Mr. Vince Ille, Assistant Director for Compliance, Bielfeldt Athletic Administration Building, 1700 S. Fourth Street, Champaign, IL 61820, (217) 333-5731, E-mail: *ille@uiuc.edu*.

Immediately, the university administration received questions about the reach of what was accurately termed a

"preclearance directive." Chancellor Aiken directed Associate Chancellor Larry Mann to oversee Mr. Ille as he responded to inquiries.

The same day Aiken's e-mail went out, plaintiff Frederick Hoxie e-mailed Aiken, stating his desire to advise prospective student-athletes of the university's unresponsiveness to the concerns of Native Americans. Hoxie said he thought the preclearance directive barred him from writing to prospective students, and he asked for guidance.

Almost a week after Hoxie's request, on March 8, Ille asked the NCAA, in writing, for guidance as to whether its rules applied in six specific situations:

1. telephone calls where the recipient is "selected based on his or her participation in athletics"

2. telephone calls "for the purpose of discussing issues related to athletics or the prospective student-athlete's possible participation in intercollegiate athletics"

3. correspondence where the recipient is "selected based upon his or her participation in athletics"

4. correspondence "for the purpose of addressing issues related to athletics or the prospective student-athlete's possible participation in intercollegiate athletics"

5. in-person off-campus contact where the recipient is "selected based upon his or her participation in athletics"

6. in-person off-campus contact "for the purpose of addressing issues related to athletics or the prospective student-athlete's possible participation in intercollegiate athletics"

The NCAA replied the same day:

> NCAA recruiting regulations are designed in part to protect prospective student-athletes from undue pressures that may interfere with their scholastic or athletics interest as well as to promote equity among member institutions in their recruiting of prospects. In this regard, if an institution either identifies and contacts a group of prospective students based on their athletics ability or contacts prospective students to discuss their athletics participation those contacts are subject to NCAA regulations. Therefore, as outlined in your questions, if an institutional staff member makes a telephone contact, an in-person off-campus contact or sends written correspondence to a prospective student to discuss his or her athletics ability or possible participation in intercollegiate athletics such contacts would be considered recruiting contacts and would be subject to NCAA regulations. Further, if an institutional staff member makes a telephone contact, an in-person contact or sends written correspondence to prospective students who have been identified based on their athletics ability such contacts would be considered recruiting contacts regardless of the content of the message and thus would also be subject to NCAA regulations. I hope this information is helpful. Please feel free to contact me if you have further questions.

After receiving the NCAA response, on March 14, Ille informed Hoxie that the directive applied in four situations: when a prospective student-athlete is identified for contact based on participation in athletics, if the contact is made to address any issue relating to athletics, if it is made to address the prospective student's possible participation in athletics, or if it is made at the request of a member of the athletics department.

On March 19, the statements from his e-mail were essentially reiterated by Chancellor Aiken in an address to the faculty Senate:

The University values and defends the principles of free speech and academic freedom for members of the University community.

The University does not seek to interfere with the expression of views regarding matters of public concern. However, we also are a member of the NCAA, and are committed to controlling our intercollegiate athletics program in compliance with the rules and regulations of the NCAA.

This means that we expect members of the University community to respect NCAA rules, and certainly not intentionally violate them.

As explained in my e-mail of March 2, there are numerous and detailed NCAA rules regarding contacts by faculty and other University representatives with prospective student-athletes. The NCAA Division I Manual itself is 480 pages long. That is why my e-mail advised that any such contacts should occur only with the express authorization of the Director of Athletics or his designee, who have experience in these issues. This is the same policy that this campus consistently has followed in regulating contacts with prospective student-athletes.

I have sought advice from the DIA compliance officer, Vince Ille, and Legal Counsel on this issue. Mr. Ille also consulted with the NCAA.

We expect members of the University community to express their viewpoints without violating NCAA rules concerning contacts with prospective student-athletes. Numerous such opportunities abound, including letters to the editor, press releases, radio/TV interviews, leafleting, and public speeches. Various faculty members and others have availed themselves of these opportunities over the years.

> Let me address one other point: we have received some e-mails in response to my March 2 e-mail that pose a series of hypothetical questions about the First Amendment and other issues. Engaging in a debate at this time about such matters hardly seems helpful or productive.

In two ways, Aiken's statement was broader than the NCAA response: it applied to students as well as staff members, and it applied to all prospective contacts with prospective student-athletes. Similarly, Mr. Ille did not limit the reach of the preclearance directive. Rather, he said it applied to any contacts made "for the purpose of addressing any issue related to athletics." Ille insisted that persons intending to contact prospective athletes inform him of what they were going to be talking about.

These statements were seen by the plaintiffs as prior restraints on their free-speech rights so they filed this lawsuit on March 22. The district judge, the Honorable Michael M. Mihm, after a hearing on April 4, 2001, granted the plaintiffs' request and issued a temporary restraining order (TRO) two days later. The TRO enjoined the chancellor from enforcing the preclearance directive. After the entry of the TRO, Chancellor Aiken retracted part of his original e-mail in a second e-mail sent June 5, 2001:

> As you may recall, on March 2, 2001, I sent an e-mail message to persons associated with the University regarding "Contact with Potential Student Athletes." My e-mail message stated, in part, that: "No contacts are permitted with prospective student athletes, including high school and junior college students, by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee." However, in light of Judge Mihm's order of April 6, 2001 and more recent testimony by representatives of the National Collegiate

Athletic Association (NCAA), I have concluded that express authorization of the Director of Athletics or his designee should not be required. Therefore, effective this date, I am permanently retracting the above-quoted sentence of my March 2, 2001 e-mail message.

The retraction of the above-quoted language from my earlier e-mail does not lessen the University's commitment to complying with NCAA rules in the recruitment of student athletes at the University of Illinois. I continue to call upon all members of the University community to abide by the rules of the NCAA when dealing with potential student athletes. Should you have questions concerning NCAA rules, please contact Mr. Vince Ille, Assistant Director for Compliance, at the Division of Intercollegiate Athletics. Thank you.

Despite the retraction (which rendered the TRO moot) and the appointment of a new chancellor,[7] the case proceeded. The district judge ultimately entered summary judgment for the plaintiffs on their request for a declaratory judgment that the directive violated their First Amendment rights; he ordered nominal damages of $1,000 to plaintiffs Cydney Crue, Brenda Farnell, Hoxie, Stephen Kaufman, and Philip Phillips plus attorney's fees to them as prevailing parties. Chancellor Aiken appeals.

On the merits, the issue before us is whether the March 2 e-mail violated the plaintiffs' First Amendment rights. A secondary issue is whether Chancellor Aiken, in his individual capacity, is entitled to qualified immunity because the law at the time the e-mail was in force did not clearly establish that it violated the First Amendment. We review a grant of summary judgment *de novo.*

---

[7] We note, off the record, that the new chancellor has now resigned. According to the Chicago Tribune, February 26, 2004, Chancellor Nancy Cantor, who favors retiring Chief Illiniwek, resigned but denied that it was because of the chief.

As a preliminary matter, we will mention the claim that this action must be dismissed as moot because the offending e-mail has been retracted and Chancellor Aiken has resigned. Those facts render the request for injunctive relief moot; however, the requests for declaratory relief and for damages remain. When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive. *Wolff v. McDonnell*, 418 U.S. 539 (1974); *see also Powell v. McCormack*, 395 U.S. 486 (1969); *Penny Saver Publ'ns, Inc. v. Village of Hazel Crest*, 905 F.2d 150 (7th Cir. 1990). Accordingly, we will proceed to the merits.

There is no doubt that the speech involved here concerns a matter of public concern. And so to decide the merits of the dispute we must perform a balancing test. The parties disagree, however, what test should be applied. Is it the one set out in *Pickering v. Board of Education*, 391 U.S. 563 (1968), or the one announced in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) (NTEU)? Both cases and their tests concern the scope of free-speech rights enjoyed by public employees. To oversimplify, *Pickering* applies to speech which has already taken place, for which the public employer seeks to punish the speaker. *NTEU* applies when a prior restraint is placed on employee speech. That distinction seems simple enough, but of course, like almost all things legal, there are ways to argue about where the dividing line should be.

The *Pickering* Court struck a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Pickering was a teacher in a public school who wrote a letter to a local newspaper criticizing the school board's handling of a bond issue. The board dismissed him from employment. After balancing the respective rights, the Court determined that,

in the situation before it, the dismissal was improper. In *Connick v. Myers*, 461 U.S. 138, 140 (1983), the Court further fleshed out its view of what constitutes "matters of public concern."

Then, in *NTEU*, the Court considered the constitutionality of a law setting out a broad prohibition on federal employees receiving compensation for making speeches or writing articles. The Court noted that the *Pickering* test did not quite fit the situation before it. *NTEU* said *Pickering* involved a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities. The ban in *NTEU* was in the nature of a prior restraint on a large number of people on a multitude of issues. The Court determined that, when imposing a prior restraint on employee speech, the government has a greater burden than when it is making an isolated employment decision. With a prior restraint, the government must demonstrate that

> the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expressions' "necessary impact on the actual operation" of the Government.

*NTEU*, 513 U.S. at 468, quoting *Pickering*, 391 U.S. at 571.

Chancellor Aiken points out that the prior restraint in *NTEU* was broader than the one here. He argues, therefore, that we must use a *Pickering* analysis. We disagree. We are not considering whether the university improperly disciplined an individual for a single statement. Even though there are differences in scope between the enormously wide ban in *NTEU* and the one here, Chancellor Aiken's directive is a broad prohibition on speech on a matter of significant importance and public concern. It applied to 44,000 members of the university community, including students. The broad scope of the March 2 directive requires, we think, an analysis under the *NTEU* test.

We have applied the *NTEU* test in a case involving a prior restraint which is similar to the one now before us. In *Milwaukee Police Association v. Jones*, 192 F.3d 742 (7th Cir. 1999), Police Chief Arthur Jones issued a directive to his officers forbidding them from discussing with anyone, including their union representatives, any verbal or written complaint they might make against another officer. Later, the directive was clarified and expanded by subordinate officers in the police department. We found that the *NTEU* test was appropriate because the directive banned speech generally; it was not an isolated disciplinary response to previously uttered speech.

When using the *NTEU* balancing test, we look first to the interest the university sees threatened by the speech. In its view, the purpose of the speech was to harm the university's athletic recruiting in order to pressure the university into dropping Chief Illiniwek as mascot. The university says it had a compelling interest in adhering to the rules of the NCAA to protect its athletic program, that program being of particular importance to the university. The university, having had prior unpleasant experience with NCAA sanctions, was particularly concerned with NCAA rules. It points out that the NCAA has broad authority to enforce its rules and to sanction institutions and athletes for violations. For minor violations it can terminate an institution's recruitment of an athlete, impose ineligibility on an athlete, require the institution to forfeit a game for a rules violation, impose a fine, or reduce the number of financial aid awards the institution can grant. NCAA bylaw 19.6.1. For more serious violations it can place an institution on probation, prohibit recruiting efforts for a year, reduce the number of financial aid awards it can grant, and even terminate institutional staff members. NCAA bylaw 19.6.2. And in this case, in fact, NCAA and Big Ten officials informed Chancellor Aiken that the NCAA rules covered communications designed to dissuade athletes from enrolling in the

university. In addition to protecting itself from sanctions, the university also says it wants to protect prospective athletes from undue pressure and to maintain an efficient recruiting program.

For their part, the plaintiffs assert their long-standing interest in convincing the administration that Chief Illiniwek hurts the university by, for example, creating a hostile environment for Native American students. The plaintiffs' speech is "addressed to a public audience . . . made outside the workplace, and involve[s] content largely unrelated to their government employment." *NTEU*, 513 U.S. at 466. They say they do not intend to harm the university but seek to make it a better place "free of a mascot that mocks the religious rituals of Native Americans." They also say they have an interest in the timeliness of their activity because the NCAA rules limit the timing of recruiting activity. The preclearance directive does not have a schedule for the review of proposed communications. Therefore, nothing prevents Mr. Ille from delaying approval of their communications until the recruiting season is over.

Because we are dealing with a significant prior restraint on speech, we must determine whether the impact of the speech on the actual operation of the university and its athletic program outweighs the plaintiffs' right to free expression on the matter which is, as we have noted, a clear issue of public concern. First, we note that the fact that the NCAA might or might not like the speech cannot ultimately control a First Amendment issue like this. This is especially true where, as here, the mission of the NCAA is not related to the purpose of the speech. It would seem that the university should reasonably have questioned further the NCAA response that its rules prohibited the speech at issue. The plaintiffs were able to easily determine that there was no real threat that the university would be penalized because of their activities. In response to an inquiry, the NCAA stated to the plaintiffs that they may,

without causing sanction to the university, send letters informing prospective student-athletes about the Chief Illiniwek controversy. Even without that assurance, one surely could doubt that the NCAA would venture to over-step its bounds in this manner and be seen as protecting an individual university's questionable mascot when so many other universities have changed theirs. However, were we faced with a situation in which the university would in some way be sanctioned based on the plaintiffs' activities, it does not necessarily follow that the university's interest in preventing a sanction would outweigh a legitimate interest in protesting allegedly racially offensive behavior.

The free-speech interest of the plaintiffs—members of a major public university community—in questioning what they see as blatant racial stereotyping is substantial. That interest is not outweighed by fear that an athletic associ-ation might not approve of what they say. Furthermore, if something said by a plaintiff to prospective student-athletes is actionable in and of itself, disciplinary action, subject to a *Pickering* analysis, could be pursued by the university. For these reasons, we conclude that the district court correctly found that the plaintiffs' free-speech rights were infringed by the March 2 preclearance directive.

Chancellor Aiken's claim of qualified immunity also fails. Qualified immunity protects from civil liability those who perform discretionary functions so long as "their conduct does not violate clearly established statutory or consti-tutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The burden in establishing that a right is clearly established falls on the plaintiff. *Gregorich v. Lund*, 54 F.3d 410 (7th Cir. 1995). Whether a right is clearly established depends on the particular facts of the case. Here, that public employ-ees retain certain rights to free speech on matters of public concern has been apparent since the *Pickering* decision in

1968 and *NTEU* in 1995. We added our voice on a remarkably similar situation in *Jones* in 1999. Chancellor Aiken sent his critical e-mail in March 2001. He cannot reasonably claim that the law was unclear.

Chancellor Aiken also appeals from the award of attorney fees. He does not contest the amount of the award, but rather contends that because the fee request was one day late it should have been disallowed.

Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure says that "[u]nless otherwise provided by statute or order of the court, the motion must be filed no later than 14 days after entry of judgment . . . ." Pursuant to the introductory clause, the United States District Court for the Central District of Illinois has issued a local rule which requires fee petitions to be filed within 30 days of final judgment. The petition in this case was filed on the 31st day. The judge found that the untimely filing was due to excusable neglect and accepted the petition. Chancellor Aiken argues that the neglect in this case was not excusable.

Fed. R. Civ. P. 6(b) allows for the enlargement of time after the expiration of the specified period "where the failure to act was the result of excusable neglect." The rule also sets out actions under certain of the rules in which there can be extensions granted. Rule 54 is not among those. Indeed, we have determined that Fed. R. Civ. P. 54 is not jurisdictional. *See Johnson v. Lafayette Fire Fighters Ass'n Local 472*, 51 F.3d 726 (7th Cir. 1995). It can and has been modified by the local rule. In determining whether a late filing is the result of excusable neglect, the district court looks to whether there will be prejudice to the opposing party, the effect on the judicial proceedings, the reason for the delay, and whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993). Our review of a finding of excusable neglect is only for an abuse of discretion. *Robb v. Norfolk & Western*

*Rwy. Co.*, 122 F.3d 354 (7th Cir. 1997). We afford particular deference in procedural matters because of the trial judge's familiarity with the parties.

In this case, the delay was as short as possible—one day. The reason for it was an error in calculating the 30-day period, which should perhaps be embarrassing to the attorney but which surely cannot be said to have been in bad faith. Nor can it be said that there would be any effect on the judicial proceedings, particularly as Aiken himself asked for an extension of time of 60 to 100 days to respond to the fee petition. And, as a fundamental matter, the district judge is in the best position to decide whether the proceedings are adversely affected. We cannot find an abuse of discretion in the decision to allow the petition to be filed.

Accordingly, the judgment of the district court is AFFIRMED.

MANION, *Circuit Judge*, dissenting. The plaintiffs, faculty members at the University of Illinois, are among a number of people, in and outside the University, who have for years objected to the use of Chief Illiniwek as part of the cheerleading effort at athletic events, particularly football games. As the court notes, this symbol is, among other things, labeled a mockery of Indian customs and white people's culture. Criticism by faculty, students, and anyone else at the University who cared was unrestricted and included protests, demonstrations, radio and television interviews, letters to editors and articles published in many venues. To the plaintiffs, this was not enough. They wanted to write to

potential athletic recruits for University teams and discourage attendance because of the offensive use of the Chief. But when the NCAA issued a guarded warning that direct contact with potential recruits by University officials could violate NCAA regulations, the University reacted. Chancellor Aiken issued the e-mail that stated in part:

> . . . [T]he NCAA regulates the timing, nature and frequency of contacts between any University employee and prospective athletes. It is the responsibility of the coaches and administration in the Division of Intercollegiate Athletics to recruit the best student athletes to participate in varsity sports at the University of Illinois. No contacts are permitted with prospective student athletes, including high school and junior college students, by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee.

> The University faces potentially serious sanctions for violation of NCAA or Big Ten rules. All members of the University community are expected to abide by these rules, and certainly any intentional violations will not be condoned. . . . Questions about the rules should be addressed to Mr. Vince Ille, Assistant Director for Compliance . . . .

The district court ruled that this was an unconstitutional prior restraint on speech and issued a temporary restraining order. Chancellor Aiken retracted the directive, but the damage was done. The court awarded $1,000 damages to each plaintiff plus attorney's fees.

## I.

On appeal, the critical question before us is which balancing test applies to the Chancellor's directive regarding

speech by state employees: the balancing test derived from *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138, 140 (1983) (*Pickering/Connick*), or the strict scrutiny approach of *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) (*NTEU*). We need to offer clear guidance as to when the heightened scrutiny of *NTEU* does and does not apply. Instead the court treats all prior restraints alike without balancing the governmental interests at issue. In effect the court creates a new rule of law pronouncing that *NTEU* applies to all "broad prohibitions" on government employee speech. Such "broad prohibitions" are defined as involving a "large number" of potential plaintiffs concerning a matter of "significant importance." For these and the following reasons, I respectfully dissent.

## II.

As an initial matter, both the district court and this court summarily conclude that the e-mail is a prior restraint. The prior restraint label, however, has a significantly different meaning when applied to the speech of governmental employees (as is the case here) than when applied to non-governmental employees. It is clear that "the State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Connick*, 461 U.S. at 140 (quoting *Pickering*, 391 U.S. at 568). While this circuit has not squarely addressed the variations or gradations of prior restraints in the government employee context after *NTEU*, it is well settled that traditional prior restraint analysis is inappropriate where the government acts under its special authority as an employer. *See, e.g.*, *Weaver v. United States Information Agency*, 87 F.3d 1429, 1440 (D.C. Cir. 1996). In fact, "courts have uniformly assessed prior restraints in the setting of

government employment by standards less demanding than those used for traditional prior restraints." *Id.* at 1443.

Calling the e-mail a "preclearance directive," even if an accurate label, does not establish that the e-mail constitutes a prior restraint subject to the heightened scrutiny of *NTEU* in the context of government employment. The distinction between a relatively mild preclearance directive and a broad general prohibition on speech in the employment context—i.e., a full-fledged prior restraint—is significant. We have yet to address in a published opinion whether *NTEU* applies in cases of preclearance directives and we have applied *NTEU* in only one reported case involving a sweeping, general ban (or prior restraint) on speech. *See Milwaukee Police Assoc. v. Jones*, 192 F.3d 742, 750-51 (7th Cir. 1999).

*Jones* amplifies the differences between a preclearance directive and a more sweeping general ban. *Jones* addresses a ban on "all communication before it occurs." *Id.* at 749. The Police Chief of Milwaukee issued an order to all police department employees, stating that if any employee made a verbal or written complaint against another employee, the complaint had to remain confidential. *Id.* at 744-45. In fact, the Chief's directive forbade complaining members from discussing the matter with their lawyer and/or union representative. *Id.* at 745. The ban emphasized that complaining officers "are to be instructed not to discuss the matter with *anyone.*" *Id.* (emphasis added).

In sum, *Jones* addresses an actual prohibition of speech in totality, including mere discussion of the matter. *Jones* did not involve a simple prepublication review of speech. *Cf. Weaver*, 87 F.3d at 1443 (holding valid under *Pickering* and *NTEU* a prepublication review of speech). In contrast to the broad, sweeping (and total) ban on speech at issue in *Jones*, the e-mail at issue here merely applied to a narrow band of speech by University employees directed only at potential

student athletes who were currently in high school or junior college. It is undisputed that the e-mail is viewpoint- and content-neutral, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986), and is not intended to censor any certain message, whether it be in favor of or against the Chief. *See* Appellee's brief, p. 19 ("[T]he Preclearance Directive applies without regard to the content of the communication, if the student is selected because of his or her participation in athletics.").

The e-mail does not purport to prohibit the right to leaflet, make speeches, write letters to the editor, or freely debate/discuss the merits or demerits of the Chief in any forum. Instead, the plain language of the e-mail merely reminds potential speakers of the time restrictions imposed by the NCAA rules on contacting prospective student athletes. It also cautions that intentional violations of these rules will not be condoned. This is a prototypical prepublication review calling for a dialogue between potential speakers and the University in order to assess the appropriate manner and timing for the speech. The D.C. Circuit has upheld a similar directive requiring a dialogue with the government before publication. *See Weaver*, 87 F.3d at 1431, 1435. Accordingly, the e-mail should not receive the heightened scrutiny of *NTEU*, which *Jones* properly reserves for sweeping, general bans on all communications.

Even if the preclearance directive were properly labeled as a full-fledged prior restraint in the government employee context, not all prior restraints on speech are analyzed under the same test. *Jones*, 192 F.3d at 749. Prior restraint analyses applicable to private sector plaintiffs do not apply when the plaintiffs are government employees. *Id*; *Weaver*, 87 F.3d at 1440 ("There is certainly no logical reason to think that the existence of some element of prior restraint should remove a restriction on employee speech from the usual *Pickering* approach."). Here, however, the court

departs from the traditional balancing test applied to government employees and instead applies the heightened scrutiny of *NTEU.* This application more closely resembles the test for prior restraints involving private sector plaintiffs. In choosing the *NTEU* heightened scrutiny test, the court reasons: (1) "*NTEU* applies when a prior restraint is placed on employee speech"; (2) the Preclearance Directive "is a broad prohibition on speech on a matter of significant importance[1] and public concern"; and (3) the preclearance directive applied to "44,000 members of the university community." *Ante* at 15, 17.

These reasons do not suffice. The court even acknowledges the oversimplified nature of its conclusion that *NTEU* applies to all prior restraints and that *Pickering/ Connick* applies to instances of speech that have already taken place. Not only is the before-and-after distinction an oversimplification, but, as *Jones* makes clear, it is a misstatement of law. *See Jones*, 192 F.3d at 749; *see also NTEU*, 513 U.S. at 480 (O'Connor, J., concurring/dissenting) ("[R]eliance on the *ex ante/ex post* distinction is not a substitute for the case-by-case application of *Pickering*.").

And while the speech clearly involves a matter of public concern, the Directive is not so clearly a broad prohibition. The court's claim that the e-mail applies to 44,000 students, faculty, and staff of the University ignores *NTEU*'s critical distinction concerning the scope of the speech prohibited by the government. The 44,000 number may accurately reflect the entire population of the University of Illinois, but this case involves far fewer potential speakers: only those plaintiffs employed by the University.

---

[1] It is undisputed that the plaintiffs' speech involves a matter of public concern. Whether the speech is of "significant importance" or not should be of no concern to this court.

Even so, the fact that there were nearly two million potential speakers at issue in *NTEU*, 513 U.S. at 481-82 (O'Connor, J. concurring/dissenting), was not the determining factor in the Court's decision to apply strict scrutiny. Nor should the 44,000 number, or a much smaller number, be dispositive here. In addition to focusing on the number of potential plaintiffs, *NTEU* emphasized the "sweeping statutory impediment to speech," which the opinion characterized as a "*wholesale deterrent to a broad category of expression* by a massive number of potential speakers." *Id.* at 467 (emphasis added) (footnote omitted). The emphasis should not be on numbers, but rather on the degree to which speech is deterred and the avenues of speech left open to the plaintiffs. *NTEU*, 513 U.S. at 467 n.11.

*NTEU* involved a broad congressional prohibition on speech that prevented nearly two million federal employees (including lower-level employees) from accepting any compensation for making speeches or writing articles, even if the speech or article were totally unconnected to the employee's official duties. *Id.* at 457. The ban went so far as to prohibit a mail handler from receiving compensation for giving a speech on the Quaker religion and an aerospace engineer from being compensated for lecturing on black history. *Id.* at 461. To be sure, *NTEU* involved plaintiffs seeking compensation "for their expressive activities in their capacity as *citizens*, not as government employees." *Id.* at 465 (emphasis added). The ban at issue applied to "off-hour speech bearing no nexus to Government employment—speech that by definition does not relate to 'internal office affairs' or the employee's status as an employee." *Id.* at 480 (O'Connor, J., concurring/dissenting) (citing *Connick*, 461 U.S. at 149).

In stark contrast, the preclearance directive in this case did not purport to limit the plaintiffs' right to give speeches concerning the Chief controversy, to write letters to the editor, participate in demonstrations, etc. The e-

mail left open a wide variety of unfettered speech opportunities for the plaintiffs, which the plaintiffs frequently used. Instead of fully availing themselves of the many alternative speech opportunities, the plaintiffs intended to make their employee status an integral component of their speech. Specifically, they intended to write letters to potential student athletes on University letterhead to discourage attendance at the University. The preclearance directive applies solely to the plaintiffs' acts in their government employee capacity, as opposed to the plaintiffs' acts as citizens. The NCAA warning was directed at contacts with potential recruits by school officials. *NTEU* does not establish a right for government employee speakers to elevate the influence of their speech by emphasizing their official government position. In sum, the ban at issue in *NTEU* is vastly different than Chancellor Aiken's e-mail because the prohibition in *NTEU* involved a significantly greater number of potential speakers; it involved a wholesale deterrent to a broad category of expression; and it applied both to the plaintiff's capacity as government employees and as public citizens.

It is true that the prior restraint context imposes problems not present in the typical *Pickering/Connick* analysis which involves a *post hoc* disciplinary decision. *See Jones*, 192 F.3d at 750. In addition, this case is different than the typical application of *Pickering/Connick* because the plaintiffs have not suffered any adverse employment action often at issue in the application of *Pickering/Connick. See, e.g., Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Regardless, there is no authority for applying *NTEU* to all cases of prior restraints. *See Jones*, 192 F.3d at 749. Applying the heightened standard of *NTEU* to restrictions

on employee speech is the exception, not the rule.[2] *See, e.g.*, *Belcher v. City of McAlester*, 324 F.3d 1203, 1206 n.3 (10th Cir. 2003) (rejecting request to apply *NTEU* to prior restraint because the restraint was narrow and left open ample alternate channels of communication). Likewise, this case is far removed from the facts of *NTEU*. The *Pickering/Connick* balancing test is appropriate because the e-mail leaves open many alternate venues for the plaintiffs to communicate their message. In fact, we have previously applied *Pickering/Connick* and rejected an invitation to apply *NTEU* to prohibitions that are not a "blanket restriction on speech" where "alternate venues" are left open for the plaintiffs' communication. *See Messman v. Helmke*, 133 F.3d 1042, 1047 (7th Cir. 1998).

Under *Pickering/Connick*, the proper analysis requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick*, 461 U.S. at 140 (quoting *Pickering*, 391 U.S. at 568). The government's interest when acting as a mere sovereign is subordinate, but the government's interest as an employer is a "significant one." *Waters v. Churchill*, 511 U.S. 611, 675 (1994). In conducting this balance, the Supreme Court cautions that we are to give substantial weight to government employers' reasonable predictions of disruption, even when the speech involved

---

[2] There is no legal requirement that the speech actually be delivered before *Pickering/Connick* can be applied. That is, the government's interest can be weighed in anticipation of the potential effect, without having to wait and review the impact of the speech after the fact. *See NTEU*, 513 U.S. 454, 481 (O'Connor, J. dissenting, concurring) (emphasizing that the *ex ante/ex post* distinction is not the determinative factor triggering *NTEU* heightened scrutiny).

was on a matter of public concern. *Id.* at 673-74. In fact, the Supreme Court has deferred to reasonable predictions of disruption by upholding a congressional ban on Executive Branch employees from taking an active part in political campaigns or political management. *Public Workers v. Mitchell*, 330 U.S. 75, 99 (1947).

The plaintiffs' depositions reveal that the purpose behind the letter-writing campaign was to encourage potential student athletes not to attend the University. We have consistently permitted government employers to take pro-active steps when facing obvious acts of disruption by employees. *See Sullivan v. Ramirez*, 360 F.3d 692, 701 (7th Cir. 2004) (balancing "the potential disruptiveness" of the speech); *Greer v. Amesqua*, 212 F.3d 358, 372 (7th Cir. 2000); *Propst v. Bitzer*, 39 F.3d 148, 152 (7th Cir. 1994). The Illinois legislature has declared national athletic competition "essential" to the state's schools and their finances. 110 ILCS 25/2(c). Damage to recruiting or other aspects of the athletics program is damage to the University's bottom line.[3] *See Messman*, 133 F.3d at 1047;

---

[3] The court does not discuss the University's interest in effective recruiting and maintaining a sound bottom line. Our precedent emphasizes that "[e]fficiency and fiscal responsibility are powerful governmental interests." *Messman*, 133 F.3d at 1047. The plaintiffs acknowledge the University's actual interest in recruiting speech and that Chancellor Aiken "might constitutionally require pre-approval of such contacts." Nor does the court discuss the University's interest in regulating the timing of potentially intimidating, confusing, or burdensome communication to impressionable teenage athletes who are entitled to privacy. *Cf. Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1541 (7th Cir. 1996) (permitting principal to prescreen for speech that "materially interfere[d] with school procedures and intrude[d] into school affairs or the lives of others."). Far from being "paternalistic" as the plaintiffs claim, such concerns are the basis for the NCAA

(continued...)

*cf. Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999) (upholding defendants' predictions of disruption that state employee's "refusal to promote the proposed change would result in negative publicity and decreased morale, in turn impairing . . . profitability.").

The government interest here goes beyond the obvious interest in effective recruiting. Compliance with NCAA regulations concerning the quantity and timing of contacts between representatives of the University and prospective student athletes is critical to the University. For even "secondary," "isolated," or "inadvertent" violations with "minimal" effects, the NCAA wields an arsenal of stiff sanctions, including terminating the school's recruitment of a particular athlete, imposing ineligibility on an athlete, requiring a school to forfeit a game in which an impermissibly contacted athlete played, and fines. *See* NCAA Bylaws 19.02.2.1; 19.6.1. The University had been sanctioned three times for major rules violations shortly before the tenure of Chancellor Aiken and it is undisputed that Chancellor Aiken was concerned that the plaintiffs' letter-writing campaign could violate NCAA recruiting rules.

NCAA rules strictly limit recruiting activities by "institutional staff" which includes "faculty members." NCAA Bylaw 13.1.2.3(a). The NCAA rules apply to "general correspondence related to athletics." NCAA Bylaw 13.4.1. In order to be certain that the prospective faculty contacts were subject to NCAA rules, Chancellor Aiken questioned NCAA and Big Ten Conference officials before sending the e-mail. In response, NCAA rules expert Denise O'Meally explained in an e-mail that NCAA regulations apply when "an institution either identifies and contacts a group of

---

(...continued)
**rules limiting the number and timing of recruiting contacts to prospective student athletes.**

prospective students based on their athletics ability or contacts prospective students to discuss their athletics participation." Before sending the e-mail, Chancellor Aiken also conferred with various University officials and with in-house and outside counsel before concluding that the letter-writing campaign potentially fell within NCAA restrictions.

The plaintiffs' attorneys later obtained a letter from the NCAA stating that the letter-writing campaign would not likely result in sanctions provided that the University "either was unaware of the correspondence or acted reasonably to preclude it from being sent." Regardless, the constitutional inquiry is not whether the school would have faced sanctions due to the letters. The plaintiffs' attempt to question the likelihood of sanctions is an especially unhelpful inquiry in reviewing plaintiffs' motion for summary judgment, because all disputed issues of fact must be resolved in favor of Chancellor Aiken. Instead, the test is whether the e-mail was reasonably necessary to prevent anticipated harms. *See NTEU*, 513 U.S. at 475; *Myers v. Hasara*, 226 F.3d 821, 826 (7th Cir. 2000) (balancing the government interest based on the facts *reasonably known* to the government employer). As stated above, the e-mail served to caution employees that, due to NCAA regulations, a dialogue was necessary before the contacts with student athletes could be made. Even under the plaintiffs' view of the regulations, the University could face sanctions if it did not act reasonably to preclude from being sent a communication in violation of the rules. The e-mail was a reasonable response and is entitled to the deference normally given to government predictions of harm used to justify restrictions on employee speech. *See Waters*, 511 U.S. at 673. The careful investigation and advice sought by Chancellor Aiken establishes that the e-mail was not written out of mere conjecture or speculative fear. *Cf. NTEU* at 475 (citing *Turner Broadcasting System v. FCC*, 512 U.S. 622, 664 (1994)).

Turning to the plaintiffs' interest, the balancing test, again, considers the plaintiffs' interest as a citizen in commenting upon matters of public concern. The plaintiffs' interests, as *citizens*, are not impacted by the e-mail, only their interests in commenting as government employees. *Connick*, 461 U.S. at 140. As a citizen, the plaintiffs remained free to hold news conferences, write letters to the editor, deliver public speeches, engage in rallies or protests, or speak publicly in any other way concerning the Chief controversy. In fact, the record is replete with examples of plaintiffs appearing on radio and TV regarding the Chief, writing newspaper articles, addressing the board of trustees, and participating in anti-Chief marches and demonstrations. An enormous category of speech remains open to the plaintiffs, not to mention the availability of anonymous speech. *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 343 (1995) (extolling the United States' respected tradition of anonymity in the advocacy of political causes).

This is simply not a case where the University is attempting to suppress the plaintiffs' message, which happens to be against the Chief. At issue here is the plaintiffs' demand that they be permitted to use their status as University professors or employees to magnify the impact of their speech by directly contacting and discouraging potential athletes. The court complied by granting to the plaintiffs an extended right to communicate in their capacity as government employees in a time, place, and manner of their own choosing. The court does not consider the many alternative modes of communication left open to the plaintiffs and whether such alternatives were adequate when balanced against the University's concern for violating NCAA regulations. *Myers v. Hasara*, 226 F.3d 821, 828 (7th Cir. 2000) (citing *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999)). The plaintiffs were already using numerous venues to communicate their message in ways less disruptive to the University, but still communicating

with anyone willing to read or listen. The First Amendment
does not require the University to eliminate the time
requirements of the NCAA regulations and allow University
employees the imprimatur of official positions to communi-
cate to prospective student athletes.

Even if the court were correct that *NTEU* applied to this
case and that balance tipped in favor of the plaintiffs,
qualified immunity applies to Chancellor Aiken. Assuming
there were a constitutional violation, in order to remove the
cloak of qualified immunity, the plaintiffs have the burden
of proof to show that the law prohibiting Chancellor Aiken's
conduct was "clearly established." *Gregorich v. Lund*, 54
F.3d 410, 413 (7th Cir. 1995). The test for whether the law
was clearly established must be conducted based on the
specific facts of the case, and not at a high level of general-
ity. *See Greenberg v. Kmetko*, 922 F.2d 382, 383-84 (7th Cir.
1991).

Here, both *Pickering/Connick* and *NTEU* involve bal-
ancing tests and, unless there is "very closely analogous"
case law, the balance struck by the official will not remove
qualified immunity. *See Gregorich*, 54 F.3d at 414. Plaintiffs
have not identified any such closely analogous case law. The
obvious proposition that prior restraints are disfavored is
far too general to satisfy the plaintiffs' burden. As set forth
above, Chancellor Aiken did not act without caution. He
consulted attorneys and relied upon advice by the NCAA
before sending the e-mail. The court merely relies upon
*Jones* to support its conclusion that the law was clearly
established. As set forth above, *Jones* involved an actual
prohibition on speech, unlike the prepublication review at
issue here. *Jones* banned all speech concerning disciplinary
matters and did not leave open any alternative channels of
communication. In contrast, the e-mail at issue here did not
purport to make discussions regarding the Chief confiden-
tial. The plaintiffs remained free to write letters to the
editor, engage in protests, lead discussion, give public

speeches, etc. The plaintiffs have not approached meeting their burden of showing "very closely analogous case law" and Chancellor Aiken is thus entitled to qualified immunity.

## III.

The *Pickering/Connick* balancing test applies to Chancellor Aiken's e-mail because it merely places time restrictions on a narrow band of communication by plaintiffs in their capacity as government employees. The e-mail is not a "wholesale deterrent to a broad category of expression by a massive number of potential speakers" and thus the test for applying the heightened scrutiny of *NTEU* is not met. Under the *Pickering/Connick* test, the government has an important interest in the efficiency of recruiting; in complying with NCAA time limitations regarding contacts with prospective student athletes; and in protecting prospective student athletes from intimidating, confusing, or burdensome communication. Moreover, the e-mail leaves open a wide variety of alternative communication, of which the plaintiffs have taken advantage. Finally, Chancellor Aiken is entitled to qualified immunity because the plaintiffs have failed to meet their burden of showing very closely analogous case law controlling the outcome of this case. I therefore DISSENT from the court's decision and would vacate the district court's judgment as to the plaintiffs' request for declaratory relief and damages and grant Chancellor Aiken's motion for summary judgment.

A true Copy:

    Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*