In the

# United States Court of Appeals

### For the Seventh Circuit

No. 03-3956

JENNY WERNSING, CHARLES
BINGAMAN and TROY CANNON,

*Plaintiffs-Appellees,*

*v.*

ODELL THOMPSON, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 01-1476—**Michael M. Mihm**, *Judge.*

ARGUED MAY 13, 2005—DECIDED SEPTEMBER 9, 2005

Before CUDAHY, EASTERBROOK and KANNE, *Circuit Judges.*

CUDAHY, *Circuit Judge.*  Three Internal Security Investigators in the Office of the Inspector General of the Illinois Department of Human Services brought suit under 42 U.S.C. § 1983, alleging that the Inspector General of Illinois had (1) imposed a prior restraint on their Constitutionally protected speech and (2) retaliated against them for exercising their First Amendment rights after they voiced concern over the Inspector General's rumored plans to make a key appointment. Plaintiffs requested both money damages and an injunction prohibiting further restrictions on their speech. Both sides moved for summary judgment.

The district court ruled that (1) the plaintiffs' request for injunctive relief is moot, (2) the Inspector General's directive barring plaintiffs from speaking to any "external agent" without his permission constituted an impermissible prior restraint on speech, (3) questions of fact remained for trial as to whether plaintiffs had suffered retaliation for exercising their First Amendment rights and (4) the Inspector General is not entitled to qualified immunity as to either claim. The Inspector General now appeals, claiming that he is entitled to qualified immunity. We reverse and remand.

## I.   FACTUAL BACKGROUND AND DISPOSITION BELOW

While this case presents several nuanced legal questions, the underlying facts are not disputed.[1] The plaintiffs served as Internal Security Investigators II (ISI 2s) in the Office of the Inspector General (OIG) in the Illinois Department of Human Services (DHS) at all times relevant to this suit.[2] The OIG is responsible for investigating reports of abuse and neglect of the mentally ill and developmentally disabled persons who receive DHS services. According to the job description, an ISI 2

> performs highly responsible, sensitive, and confidential investigative work; conducts the gathering and analysis of relevant facts and data concerning abuse and neglect investigations; completes investigations by preparing

---

[1] The facts in ths section are taken primarily from the district court's opinion below. *Wernsing v. Thompson*, 286 F. Supp. 2d 983, 989-91 (C.D. Ill. 2003).

[2] Jenny Wernsing was hired as an ISI II in 1998, Charles Bingaman was hired in 1997, and Troy Cannon was hired in 1996. Charles Bingaman later became an OIG Team Leader in 2000, giving him additional responsibilities from time to time.

reports, summarizing investigative activities and recommends conclusions to findings.

SPECIFICALLY:

1. Conducts confidential, sensitive, and complex investigations concerning reports of abuse and neglect at State-operated facilities and community agencies: gathers data and evidence, conducts interviews, receives reports and analyzes relevant evidence concerning cases of abuse and neglect; ensures that case reports are comprehensive and accurate; takes initial statements from staff.

2. Prepares written investigative reports upon the completion of the investigative process consisting of a summary of actions taken, findings, preservations of evidence and recommendation for corrective action and/or case closure.

3. Maintains confidential files pertaining to cases under investigation; ensures the security of all pertinent information gathered during the investigatory process.

4. Recommends revisions to investigatory procedures and practices.

5. Serves as an expert witness and provides testimony in criminal and administrative hearings related to the conducting of or results of the investigation.

6. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above.

(Doc. 38, Wernsing Dep. Exh. M8.) In the fall of 2000, the OIG was subdivided into four geographical Bureaus: the North (Chicago), the Metro (the area surrounding Chicago), the Central and the South. All ISI 2s report to a designated Team Leader, who reports to the appropriate Bureau Chief,

who in turn reports to the Deputy Inspector General or the Inspector General.

Defendant Odell Thompson, Jr. became the Inspector General of the DHS on July 1, 2000. On or about November 27, 2000, Thompson received an e-mail from five employees in the OIG's Southern Bureau, including plaintiffs Wernsing, Bingaman and Cannon, which stated:

> Several investigators in the Southern Bureau have some concerns we wish to discuss with you as soon as possible. These concerns are relative as to who we understand you are going to appoint as the Southern Bureau Chief. These concerns are very important and need your attention before any appointment is made.

(Doc. 38, Wernsing Dep., Exh. 1.) Thompson received the e-mail but did not respond to it. On November 30, 2000, Thompson received another e-mail from the same five employees, stating in relevant part:

> We contacted you on 11/27/00 asking that you meet with us and discuss our serious concerns over who we understand to be the tentative selection for Bureau Chief. We have not heard from you. We once again ask that you meet with us. We would like if at all possible to keep this matter in house out of respect for the chain of command and in keeping with respect for your position. However, if we are not afforded this oppor-tunity we will feel compelled to air our concerns to the Secretary or those at the legislative level.

Again, Thompson did not respond to the request for a meeting and made no inquiries into the basis for the e-mail.

The concerns referenced in the two e-mails apparently stemmed from rumors that Thompson was going to ap-point Ron Fuentes as Bureau Chief of the OIG Southern Bureau. Each of the plaintiffs had worked with Fuentes

when he had previously served as Bureau Chief, and they had concerns about his ability to manage the Bureau effectively. Specifically, plaintiffs allege that Fuentes had presided over a large backlog of investigations which caused staffing shortages in the DHS and delays in OIG investigations, had misplaced OIG files which were later found in the trunk of his car, had worked short days and was on-site at the Bureau office only two days out of the week and was generally considered an incompetent and frustrating supervisor. (*See* Wernsing Br. at 12-14.) The backlog in investigations was particularly troubling since any delay in investigating cases of neglect or abuse could compromise the investigators' ability to gather information (since many of the victims have difficulty remembering what happened to them) or could render grievances against offending DHS employees time-barred under Illinois law.

Unaware of the specific concerns that lay behind the two e-mails, Thompson became concerned at the suggestion that the signatories might contact the Secretary of the DHS or individuals "at the legislative level." Thompson was apparently in the midst of reorganizing the OIG, and he feared that OIG employees might be trying to "sabotage" these efforts. On or about December 5, 2000, Thompson sent a letter to the five e-mail signatories that stated, in relevant part:

> The Office of Inspector General staff are not authorized to communicate about Office of Inspector General policies or operations directly to the Secretary [head of the DHS], to the press, or to any external agent except with my prior knowledge and approval.

This directive was repeated in a second communication sent to all employees in the OIG in January, 2001. Thompson later testified that there was nothing other than the two e-mails from the plaintiffs that led him to issue the December

directive and that his concern was that he "didn't want to be sabotaged in some way" because he "just didn't know what their motives were." He admitted that he didn't make any effort to ascertain plaintiffs' motives in threatening to contact the Secretary of DHS or legislators. It is undisputed that the release of confidential information by OIG employees and contacts with the press were already governed by both statute and internal DHS rules.

Believing that these directives potentially barred her from speaking to anyone outside of the OIG, Wernsing asked her supervisor, Sandy Mott, if the directives applied to conversations she might have with her union representative, an attorney or her legislator. At Mott's suggestion, Wernsing telephoned Thompson on January 26, 2001, and Thompson "yelled" at her, telling her she was "walking down the road to getting fired" and accusing her of "playing games." That same day, Mott sent an e-mail to the Inspector General's Office relaying Wernsing's question. Sydney Roberts, who was then serving as the Deputy Inspector General at the time, responded to Mott's e-mail with two messages. The first read simply: "Your people really want to try me don't they." The second e-mail stated:

> No one in the OIG is represented by a Union that is in any sort of contractual agreement with DHS. Thus we don't have to honor anything that their union representative requests unless it is consistent with the rights all employees are entitled to by state or federal law. In other words, they follow the direction of their union representative at their own peril.

> With respect to the statements made to union personnel, the courts have said that employers may regulate the speech of *certain employees in certain circumstances*. Thus, they should know the law on this matter, before discussing OIG matters with outside individuals.

(Italics in original.) On February 7, 2001, Mott then

e-mailed Wernsing the following response:

> In answer to your question, Deputy I.G. Sydney Roberts indicated to me that no one in the OIG is represented by a Union that has a contractual agreement with DHS. Thus, we don't have to honor anything that their union representative requests unless it is consistent with the rights all employees are entitled to by state or federal law. Further, with respect to statements made to union personnel, the courts have said that employer may regulate the speech of certain employees in certain circumstances. Thus, you should know the law on this matter before discussing OIG matters with outside individuals.

In March 2001, Thompson attended a meeting of the Southern Bureau staff where he finally met with the plaintiffs and the other e-mail signatories face-to-face. He asked them if they had any concerns they wanted to discuss, and they told him of the rumors concerning Fuentes' imminent appointment, and of their grave concerns about Fuentes' ability to manage the Southern Bureau effectively. They cited Fuentes' work habits, the enormous backlog of cases that had occurred under his supervision and his general inability to manage the Bureau.

Plaintiffs allege that, on the heels of these e-mail exchanges, Thompson committed several acts of retaliation for their inquiries and requests for a meeting. These included: (1) Thompson's denial of overtime pay and mileage to Wernsing and Bingaman after requests for the same had been approved by their immediate supervisor and the Bureau Chief, (2) a warning to Wernsing by the Bureau Chief to watch out because Thompson was watching everything that she did, (3) the downgrading of Wernsing and Bingaman's annual performance evaluations, (4) the introduction of false and misleading evidence at Bingaman's grievance hearing, (5) denial of Bingaman's application for

the position of Southern Bureau Chief, (6) denial of appropriate and customary travel and lodging expenses for both Wernsing and Bingaman on different occasions and (7) Thompson's denial of a pre-approved salary increase for the time Bingaman served as acting Investigative Team Leader. *See Wernsing*, 286 F. Supp. 2d at 997-98.

Plaintiffs also allege that, due to Thompson's directives prohibiting unapproved discussion of OIG business with any "external agent," they felt compelled to restrict their communications with individuals outside the OIG. Specifically, Wernsing testified that she refused to answer questions about OIG policies from employees at state facilities or community agencies, refrained from commenting publicly on changes to an administrative rule that altered the official definitions of abuse and neglect and refrained from commenting on an OIG proposal to delegate preliminary investigations concerning serious injuries to the local facility where the injury in question occurred. Plaintiff Cannon testified that he refrained from raising concerns with his state legislators about Thompson's qualifications as Inspector General while the State Senate was considering his appointment. However, there is also evidence that plaintiff Bingaman contacted both his local union steward and a state legislator regarding his troubles with Thompson in the months following Thompson's directives.

On August 3, 2001, Wernsing brought the present suit alleging that Thompson's pre-clearance directive constituted an unlawful prior restraint on speech that infringes on her First and Fourteenth Amendment rights. Bingaman and Cannon later filed a motion to intervene alleging that Thompson had violated their free speech rights by issuing the directive and had impermissibly retaliated against them for exercising those rights. In January 2003, Wernsing amended her complaint to add a First Amendment retaliation claim as well. Plaintiffs requested several types of relief, including an injunction

barring future enforcement of Thompson's directive, declaratory relief, and money damages for humiliation, stress and emotional anguish resulting from the imposition of the directive, as well as for losses stemming from Thompson's alleged reprisals against them.

The plaintiffs also named Thompson's Deputy Inspector General, Sydney Roberts, as a defendant in the suit. While the suit was pending, Thompson's tenure as Inspector General ended, and he was succeeded by Roberts. Upon assuming the post of Inspector General, Roberts submitted an affidavit to the district court averring that she had "taken no action as to any employee based on the [directives]," and that she does "not consider the . . . [directives] to be the official policy of the Office of the Inspector General."

After discovery, the plaintiffs filed a motion for partial summary judgment, arguing that they are entitled to judgment as a matter of law on their prior restraint claims. Thompson responded with his own motion for summary judgment, seeking judgment as a matter of law on both the prior restraint claim and the retaliation claim. Thompson argued that he did not violate any of plaintiffs' constitutional rights and that, in any event, he was entitled to qualified immunity as to both claims. In pressing his claim, Thompson asserted that the plaintiffs were confidential "policymaking" employees—or that he reasonably believed them to be "policymaking" employees—who could be fired for disloyal speech, and that therefore he could also place prior restraints on their expressive activity. Roberts, having formally disavowed Thompson's pre-clearance directive, sought to be dismissed from the suit.

In October, 2003, the district court ruled on the parties' motions for summary judgment. The court granted the plaintiffs' motion for summary judgment on the prior restraint claim, holding that Thompson's directives consti-

tuted a prior restraint on speech, plaintiffs' speech was constitutionally protected, Thompson's interest in preventing the speech did not outweigh plaintiffs' interest in commenting on matters of public concern and plaintiffs were not policymaking or confidential employees. *Wernsing*, 286 F. Supp. 2d at 992-97. The court next denied Thompson's motion for summary judgment on the retaliation claim, holding that plaintiffs' e-mails to Thompson (and Wernsing's inquiry regarding the scope of his directive) were constitutionally protected speech and material questions of fact remained as to whether this speech was a motivating factor in Thompson's alleged retaliatory acts against them. *Id*. at 997-99. The district court also rejected Thompson's claim of qualified immunity, holding that it was clearly established that Thompson's alleged actions restricting or retaliating against plaintiffs' speech on matters of public concern violated plaintiffs' constitutional rights. *Id*. at 999-1001. However, the district court did grant Thompson's motion for summary judgment with respect to plaintiffs' request for injunctive relief, holding that there was no substantial likelihood that Thompson's successor as Inspector General (Sydney Roberts) would enforce Thompson's directives. *Id*. at 1001-02. The court accordingly also dismissed Roberts as a defendant in the case. *Id*.

Thompson now appeals the ruling of the district court, claiming that he is entitled to qualified immunity as to all of plaintiffs' claims.

## II.  JURISDICTION

Subject to the standing requirements of Article III—to be addressed in our discussion of plaintiffs' prior restraint claim—the district court had jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. §§ 1331, 1343(a). This Court's jurisdiction now rests on 28 U.S.C. § 1291, which

provides for appellate jurisdiction over all final orders issued by the district court. Under the collateral order doctrine, the district court's denial of Thompson's motion for summary judgment based on qualified immunity is an immediately appealable "final decision" within the meaning of 28 U.S.C. § 1291 to the extent that it turns on legal rather than factual questions. *See Behrens v. Pelletier*, 516 U.S. 299, 311 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 528-30 (1985); *Tangwall v. Stuckey*, 135 F.3d 510, 515-16 (7th Cir. 1998). However, a defendant invoking an immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995).

## III. STANDARD OF REVIEW

This Court reviews *de novo* the district court's denial of a motion for summary judgment based on qualified immunity. *Upton v. Thompson*, 930 F.2d 1209, 1211 (7th Cir. 1991). Summary judgment is warranted when the evidence, viewed in a light most favorable to the non-moving party, presents "no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); s*ee also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## IV. DISCUSSION

Thompson appeals the ruling of the district court below, claiming that he is entitled to qualified immunity on both the First Amendment retaliation claim and the prior restraint claim. In *Harlow v. Fitzgerald*, the Supreme Court held that "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). Under *Harlow* and its progeny, a court evaluating a claim of qualified immunity must conduct a now-familiar two-step inquiry: First the court must determine whether the disputed conduct, as alleged, violates a constitutional right; second, the court must determine whether that right was "clearly established" at the time of the alleged conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court has explained the "clearly established" analysis as follows:

> This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . . [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.*

*Id.* at 201-02 (internal citations and quotations omitted) (emphasis added). The plaintiff carries the burden of establishing that a given right is "clearly established," *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993), and to do so

the plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right. *Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997). However, "liability is not predicated upon the existence of a prior case that is directly on point." *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996).

Mindful of these precedents, we can now address the specific claims before us. For each claim we must determine (1) whether plaintiffs have alleged violation of a valid constitutional right and (2) whether that right was "clearly established" at the time of the alleged misconduct. In this case the relevant time frames begin on or about December 5, 2000, for the prior restraint claim (the date that Thompson sent his directive to the plaintiffs) and January of 2001 for the retaliation claim (the date that Thompson began a series of alleged reprisals against the plaintiffs).

## A.  Prior Restraint Claim

### 1.  Justiciability

Before addressing the merits of plaintiffs' prior restraint claim,[3] we must first consider threshold issues of

---

[3] We note at the outset that the plaintiffs, in challenging an internal e-mail as a "prior restraint" on speech, advance a somewhat unconventional claim. Prior restraints frequently arise in the form of judicial injunctions against certain types of speech (to which the collateral-bar rule applies), or, perhaps less commonly, in the form of formal statutes or regulations barring or constraining certain expressive activity. *But see Crue v. Aiken*, 370 F.3d 668, 679-80 (7th Cir. 2004) (characterizing

(continued...)

justiciability, which bear on our jurisdiction. "Jurisdiction is the 'power to declare law,' and without it the federal courts cannot proceed." *Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999)). "Accordingly, not only may the federal courts police subject matter jurisdiction *sua sponte*, they must." *Id.* (emphasis in original); s*ee also Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 660 (7th Cir. 1998) ("A court of appeals has an obligation to examine its jurisdiction *sua sponte*, even if the parties fail to raise a jurisdictional issue.").

First and foremost is the question of standing. "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing requires three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of

---

[3] (...continued)
a university president's internal pre-clearance directive, disseminated via e-mail, as a prior restraint on speech). Here, since both sides have used the phrase "prior restraint" in marshaling their arguments, we will also use that term. However, we offer no view as to whether, as a general proposition, an e-mail directive should always be analyzed in the same way as an injunction, statute or a formal regulation.

some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id*. at 560-561 (internal citations and quotation marks omitted).

Thompson argues that plaintiffs lack standing to challenge his pre-clearance directive since they have not demonstrated any "actual injury or any imminent threat of injury due to the directive." (Thompson May 27, 2005 Supp. Mem. at 4.) Specifically, he claims that, in order to make out a concrete "injury in fact" for standing purposes, plaintiffs must have sought permission to speak, been denied, spoken out anyway and been subject to discipline. (*Id*. at 9.) This argument is both conceptually and legally flawed. First, the hypothetical chain of events outlined by Thompson describes a First Amendment retaliation case involving post-hoc punishment for disfavored speech, not a prior restraint which seeks to limit expressive activity before it occurs. Thompson's proposed paradigm would preclude litigation of prior restraints altogether.

Second and more fundamentally, the Supreme Court and this Court have held that government policies placing prior restraints on employee speech may be challenged facially. That is, government employees whose speech is limited by an internal policy or a pre-clearance directive such as Thompson's need not seek permission to speak or violate the directive in order to challenge the directive in court. *See United States v. Nat'l Treasury Employees Union (NTEU)*, 513 U.S. 454, 461-62 (1995) (allowing facial challenge to a ban on honoraria for public speaking by government employees); *Crue v. Aiken*, 370 F.3d 668, 679-80 (7th Cir. 2004) (allowing challenge to pre-clearance directive by both plaintiff who had sought permission to speak and plaintiffs who had not); *Harman v. City of New York*,

140 F.3d 111, 118 (2d Cir. 1998) (allowing facial challenge to city agency's pre-clearance directive banning unapproved speech to the media); *Providence Firefighters Local 799 v. City of Providence*, 26 F. Supp. 2d 350, 354 (D.R.I. 1998) (citing *NTEU* for this proposition).[4]

Yet establishing that plaintiffs may, as a general proposition, facially challenge a pre-clearance directive like Thompson's gets us only half way home. The undisputed evidence reveals that Thompson's directive is no longer in force, and

---

[4] Thompson cites the Ninth Circuit's decision in *Portland Police Association v. City of Portland*, 658 F.2d 1272 (9th Cir. 1981), in support of his argument that plaintiffs lack standing. However, Thompson's reliance on *Portland Police* is misplaced. In that case, the Ninth Circuit held that the Police Association could not challenge a new order from the police chief requiring police officers to prepare reports after "major incidents" and precluding them from consulting with an attorney unless their superiors determined that they might be exposed to employment sanctions or criminal liability. The court determined that since injurious application of the order to any single officer hinged on a number of contingencies, none of which had come to pass, the plaintiffs' claims of injury were too speculative and abstract to confer standing in federal court. *Id.* at 1273-74.

Here, by contrast, the injurious effects of Thompson's directive do not depend on any external contingency. The very existence of such a pre-clearance requirement raises the specter of self-censorship, even among those who ultimately receive permission to speak. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused."); *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) ("It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."); *Harman*, 140 F.3d at 120 (same) (citing *City of Lakewood*). This is precisely why facial challenges to such directives are permitted.

this raises the specter of mootness. Implicit in the "case-or-controversy" requirement of Article III is the principle that "federal courts may not give opinions upon moot questions or abstract propositions." *Worldwide St. Preachers' Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir. 2004) (internal quotations omitted). Here the district court did indeed find the issue of plaintiffs' requested injunctive relief to be moot. 286 F. Supp. 2d at 1001-02. The court reasoned that "[a]s Defendants have sufficiently demonstrated that the policy from which Plaintiffs sought relief no longer exists and that the illegal prior restraint of speech at issue in this case cannot reasonably be expected to reoccur, the claim for injunctive relief is effectively moot, as there is no need to enjoin prospective action that would violate federal law." *Id.*

This determination appears to be correct. While the mootness doctrine does not necessarily apply to voluntary cessation of illegal activity, *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747 (7th Cir. 1999), or to actions "capable of repetition yet evading review," *Krislov v. Rednour*, 226 F.3d 851, 858 (7th Cir. 2000), "the moving party must still satisfy the court that injunctive relief is required," *Milwaukee Police Ass'n,* 192 F.3d at 748. " 'The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.' " *Id.* (quoting *W.T. Grant*, 345 U.S. at 633). The mere "theoretical possibility" of a repeat violation is not enough. *Walsh v. United States Dep't of Veterans Affairs*, 400 F.3d 535, 537 (7th Cir. 2005); a*ccord In re Associated Press*, 162 F.3d 503, 511 (7th Cir. 1998) (requiring a "reasonable expectation that the same complaining party would be subjected to the same action again") (internal quotations omitted).

Here Sydney Roberts, Thompson's successor, theoretically could reimpose his pre-clearance directive, but nothing in

the record suggests that she is likely to do so. Her uncontroverted affidavit states that she has "taken no action as to any employee based on the [directive]," and that she does "not consider the . . . [directive] to be the official policy of the Office of the Inspector General." The directive at issue was personal to Thompson, and the possibility of a recurrence remains purely speculative. Thus even assuming that Thompson's directive constitutes an impermissible restraint on speech, there remains no misconduct for this court to enjoin. We have quite recently held that where an internal pre-clearance directive such as this one is permanently withdrawn or disclaimed by the government/employer, any claims for injunctive relief are moot. *See Crue v. Aiken*, 370 F.3d 668, 677-78 (7th Cir. 2004).

Plaintiffs' argument that Thompson's appeal does not implicate the district court's mootness determination—and thus that the mootness issue is not properly before us—is also unavailing. Mootness, like standing, "is always a threshold jurisdictional question that we must address even when it is not raised by the parties.*" Peterson,* 388 F.3d at 558*; see also North Carolina v. Rice*, 404 U.S. 244, 246 (1971). Plaintiffs' claim for injunctive relief is moot and will not figure in our analysis here.

However, plaintiffs also seek monetary damages for humiliation, stress and emotional anguish resulting from the imposition of the directive. Such claims are not moot, even if the underlying misconduct which caused the injury has ended. *See Powell v. McCormack,* 395 U.S. 486, 496 (1969) (holding that although injunctive relief was moot, a case or controversy still existed since the plaintiff requested declaratory relief and damages); *Crue*, 370 F.3d at 677-678 (holding that although the plaintiff's request for injunctive relief was moot, the court had to consider the merits of the case since requests for declaratory relief and damages

remained).[5] Generally, any "person whose injury can be redressed by a favorable judgment has standing to litigate," *Fed. Deposit Ins. Corp. v. Ernst & Young LLP*, 374 F.3d 579, 581 (7th Cir. 2004), and injuries compensable in monetary damages can always be redressed by a court judgment. Similarly, "[w]hen a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive." *Crue*, 370 F.3d at 677.

Thus while plaintiffs' claim for injunctive relief is moot, plaintiffs' claims for monetary damages and declaratory relief still present a live case or controversy, and therefore we must proceed to consider the substantive merits of plaintiffs' prior restraint claim.

### 2. The Merits

In granting summary judgment to the plaintiffs on their prior restraint claims, the district court ruled that Thompson's directives chilled or actually prevented plaintiffs' speech on a matter of public concern, were fatally overbroad and were based on merely conjectural concerns regarding both the content of plaintiffs' speech and its potential impact. 286 F. Supp. 2d at 992-97. Thompson's main argument on appeal—which the district court rejected, *id.* at 996-97—is that plaintiffs were "policymaking" or "confidential" employees under *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), and thus that he could restrict their speech on matters relating to OIG operations. The logic of Thompson's argument is that

---

[5] This approach squares with the general proposition that "[w]here several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests." *Powell,* 395 U.S. at 496 n.8.

since such "policymaking" employees may actually be *fired* for disloyal expressive activity under *Elrod* and its progeny, he should be able to take the less extreme measure of restricting their speech in the first instance.

This line of argument is dubious on several levels. First, it appears fairly clear that ISI 2s are not "policymaking" officials under *Elrod* and it progeny. Notwithstanding the fact that ISI 2s often handle sensitive or confidential information, there is no indication that the position "authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation,*" Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981), or that "party affiliation is an appropriate requirement for performing the job." *Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004); a*ccord Branti*, 445 U.S. at 518 (same test). At least one district court has specifically held it to be clearly established that ISI 2s are *not* policymaking employees. *Thornburg v. Peters*, 155 F. Supp. 2d 984, 990-91 (C.D. Ill. 2001); s*ee also* 20 Ill. Comp. Stat. 415/4a(2) (2005) (suggesting that ISI 2 positions are not political appointments but are to be held based on "merit and fitness").

Yet even if this point could be disputed,[6] the plaintiffs'

---

[6] As the parties point out in their briefs, the case law pulls in somewhat different directions on this point. *Compare Americanos v. Carter*, 74 F.3d 138, 142-43 (7th Cir. 1996) (holding that an Indiana Deputy Attorney General qualified as a policymaker since he researched complex legal issues concerning cases in the AG's office and had "the direct ability to implement the policies and goals of the AG for the State of Indiana") *and Hudson v. Burke*, 913 F.2d 427, 431-32 (7th Cir. 1990) (holding that the district court did not commit clear error by ruling that "investigators" or "legislative aides" for the City of Chicago Finance Committee were

(continued...)

status as policymaking employees is not necessarily relevant to the legality of Thompson's directive. Even assuming that Thompson could fire the plaintiffs for certain speech activity, it does not follow that he should be able to restrain their expressive activity *ex ante*. Certainly, from an individual employee's perspective, outright termination might appear the more extreme disciplinary measure. However, purely as a matter of First Amendment freedoms, the public ramifications of a prior restraint on speech may actually be far more severe. Unlike *ex post* reprisals for speech activity, a prospective restriction "chills potential speech before it happens," depriving the public of information that might otherwise be disseminated. *NTEU*, 513 U.S. at 468. It is therefore well settled that the government's prospective restriction of future speech is approached with a greater presumption of unconstitutionality than post-hoc disciplinary actions against specific employees for speech already uttered. *NTEU*, 513 U.S. at 467-68; *Crue v. Aiken*, 370 F.3d at 678; *Milwaukee Police Ass'n*, 192 F.3d at 749-50.[7]

---

[6] (...continued)

policymaking employees since they "have 'inherent' in their position the power to investigate, report facts and have input into those areas of politically sensitive governmental decisionmaking") *with Matlock v. Barnes*, 932 F.2d 658 (7th Cir. 1991) (affirming a jury verdict in favor of a Legal Investigator in the Gary, Indiana City Legal Department, ruling there was ample evidence that he was not a policymaking employee).

[7] In order to justify such a prospective restriction, the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 513 U.S. at 468 (quoting *Pickering*, 391 U.S., at 571); s*ee also Milwaukee Police Ass'n*, 192 F.3d at 750 (same) (quoting *NTEU,* 513 U.S. at 468). This is a more onerous burden than that required to justify post-hoc reprisals for expressive

(continued...)

Accordingly, the *Elrod* policymaker rule is traditionally applied only in cases of patronage hiring and firing, s*ee, e.g.*, *Kiddy-Brown v. Blagojevich,* 408 F.3d 346, 354-57 (7th Cir. 2005); *Thompson v. Ill. Dep't of Prof'l Regulation,* 300 F.3d 750, 751-52 (7th Cir. 2002), or in cases of First Amendment retaliation, *see, e.g.*, *Vargas-Harrison v. Racine Unified Sch. Dist.,* 272 F.3d 964, 970, 971-72 (7th Cir. 2001); *Bonds v. Milwaukee County,* 207 F.3d 969, 977 (7th Cir.), *cert. denied,* 531 U.S. 944 (2000). Accepting Thompson's novel rule would imply a bold and perhaps unwarranted departure from both Supreme Court precedent and traditional understandings of *Elrod* and its progeny. Nothing in the case law anticipates an absolute "policymaker" exception for prior restraint claims, and this would fly in the face of the Supreme Court's distinction between prospective regulations and ad hoc retaliation for specific instances of speech. The approach actually suggested by the case law is probably one whereby the politically sensitive or secretive nature of the employment context can factor into the court's evaluation of the government's justification for prohibiting the speech, including the "expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 513 U.S. at 468 (quoting *Pickering,* 391 US. at 571).

Perhaps anticipating these difficulties, Thompson also argues, in the alternative, that even if plaintiffs are not considered policymaking employees, or even if the "policymaker" exception outlined in *Elrod* does not apply to prior restraint claims, those propositions were not clearly established at the time of his alleged misconduct. For these reasons, Thompson claims he is entitled to qualified immunity.

---

[7] (...continued)
activity. *See Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir. 2004).

We are satisfied that Thompson *is* entitled to qualified immunity, though not for the precise reasons he advances. Simply put, Thompson must prevail in the present suit since it was not clearly established, at the time the pre-clearance directive was first issued (December 5, 2000), that such a directive constituted an unlawful prior restraint on speech.

Of course the case law on prior restraints is replete with decisions invalidating zoning ordinances, licensing schemes, permit regulations and other official acts that limit expressive activity. Additionally, our recent decision in *Crue v Aiken*, where we held a similar pre-clearance directive to constitute an unlawful prior restraint on speech, casts serious doubt upon the legality of Thompson's directive. *See Crue*, 370 F.3d at 680 (holding unconstitutional a university chancellor's pre-clearance directive banning all speech directed toward prospective student athletes without prior permission). However, while the constitutional limits of restraints applicable to the general public are well-settled, and while the Supreme Court has struck down formal statutory bans of certain speech activity by government employees, *see NTEU*, 513 U.S. 454, the prerogatives of a government supervisor in managing the communications of his own staff are far less clear. We emphasize that our analysis of qualified immunity here is focused specifically and exclusively on this kind of relatively informal supervisory directive aimed at close subordinates.[8] In December 2000 case law touching on this kind of internal pre-clearance directive was decidedly scant and, to the extent that it

---

[8] In this respect the present case differs significantly from *Crue*. The e-mail directive at issue in *Crue*, issued by the president of the University of Illinois, applied not just to the president's own staff or other University employees, but to all University students and all "others associated with the University." 370 F.3d at 674-75.

existed at all, actually suggested that such directives are permissible.

Indeed we have approved similar pre-clearance screening directives before. In *Zook v. Brown*, a case that came before this Court twice, we upheld a sheriff's department regulation prohibiting officers from engaging in testimonials or advertisements without prior approval of the sheriff. 865 F.2d 887, 891-92 (7th Cir. 1989) (*Zook II*). We reasoned that the sheriff had a legitimate interest in maintaining the appearance of integrity and impartiality of the police force, and the restrictions were sufficiently tailored to a narrow category of problematic speech—ads and testimonials. *Id.* Moreover, in our first treatment of *Zook* we actually held that any legal infirmity in the sheriff's order was *not* clearly established at the time of the order. *Zook v. Brown*, 748 F.2d 1161, 1165 (7th Cir. 1984) *(Zook I).* In a subsequent case, we also upheld elementary school rules requiring students to obtain prior approval of the school principal before distributing private handbills. *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1541 (7th Cir. 1996). *But see Fujishima v. Bd. of Educ.*, 460 F.2d 1355 (7th Cir. 1972) (holding unconstitutional a board of education rule prohibiting any person from distributing any publications on school premises without prior approval of the general superintendent of schools).

Two earlier Supreme Court cases dealing with pre-publication screening regulations in government agencies also point in the same direction. In *Brown v. Glines*, 444 U.S. 348 (1980), the Court upheld Air Force regulations requiring service members to obtain approval from their commanders before circulating petitions on Air Force bases. In *Snepp v. United States*, 444 U.S. 507 (1980), the Court upheld the enforcement of an agreement signed by an agent of the CIA whereby he promised not to publish any information "relating to the Agency," during or after his term of employment, "without specific prior approval by the

Agency". *Id.* at 507*; cf. Weaver v United States Info. Agency*, 87 F.3d 1429, 1443 (D.C. Cir. 1996) (upholding regulation requiring employees of U.S. Information Agency and certain other federal agencies to submit materials regarding matters of official concern to pre-publication screening).

To be sure, these cases are in some respects distinguishable from the present case. The regulation at issue in *Zook* (which was limited to ads and testimonials) was far more narrowly tailored than the one issued by Thompson here, which simply prohibited all communication regarding OIG operations with any "external agent." Additionally, even as it affirmed the sheriff's screening of police officer advertisements and testimonials, the panel in *Zook* reiterated its belief that the regulation would not prohibit speech on matters of public concern and warned against broader restrictions that might give "unfettered enforcement discretion." 865 F.2d at 892. Most of the other cited cases also involve unique institutional settings such as an elementary school (*Muller*), the armed forces (*Brown*) and the CIA (*Snepp*), contexts where the government presumably has a heightened interest in preempting certain types of speech. Additionally, all of these cases predated the Supreme Court's more exacting pronouncements on prior restraints in *NTEU* and *Davis*.

Yet all this is just to say that Thompson's directive was not clearly *authorized* by existing case law as of November 2000. The relevant question, however, is not whether his actions were expressly authorized by existing law, but whether they were clearly *forbidden*—i.e., whether a reasonable official would have known the actions in question were illegal. *Saucier*, 533 U.S. 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). In the absence of a case factually similar to the one at bar, an official is entitled to qualified immunity

unless the alleged misconduct constitutes an obvious violation of a constitutional right. *Chan*, 123 F.3d at 1008. Yet to the extent that these cases— distinguishable as they are—point in any direction, they suggest that pre-clearance directives such as this one are permissible.

The institutional context of Thompson's directive is also relevant here. While it is not the CIA, the OIG is an agency that depends on confidentiality and secrecy in carrying out its public mission. In the course of its investigations the OIG routinely handles extremely sensitive information, and its employees must adhere to strict confidentiality requirements. Under the circumstances— and given the state of the law at the time—it may not have been unreasonable for Thompson to think that he could instruct his own employees not to discuss agency business with outside parties.

The district court, of course, arrived at a contrary ruling, stating that "long before Thompson issued his directive, the Supreme Court had held that 'any prior restraint on expression comes to this Court with a "heavy presumption" against its constitutional validity,'" and asserting that "it was equally well-established that prior restraints, often referred to as a 'most extraordinary remed[y]', have been upheld 'only where the evil that would result from there portage is both great and certain and cannot be militated by less intrusive measures.'" 286 F. Supp. 2d at 999 (quoting *Davis*, 510 U.S. at 1317). The district court concluded by stating that "it was clearly established prior to December 2000 that if Plaintiffs wanted to speak on a matter of public concern, and their interests in doing so outweighed any of Thompson's legitimate interests, precluding their speech without substantial justification and retaliating against them for that speech would be illegal." *Id*. at 1000.

Yet this formulation is exactly what the Supreme Court has instructed courts *not* to do—it frames the clearly established inquiry in terms of a general proposition rather than the specific factual situation that confronted the defendant official. The Court has been quite clear that

"[t]his inquiry . . . *must be undertaken in light of the specific context of the case, not as a broad general proposition . . . .* The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" *Saucier*, 533 U.S. at 201-02 (emphases added). If the clearly established question could be resolved merely by observing that unjustified prior restraints on speech are prohibited, then no defendant could ever prevail on the clearly established prong of the qualified immunity analysis—the inquiry would always produce an outcome identical to that issuing from the first prong of the immunity analysis (violation of a valid legal right).[9]

In short, a reasonable official in Thompson's position could not have known definitively, in December 2000, whether issuing such a pre-clearance directive violated plaintiffs' First Amendment rights. *See Saucier,* 533 U.S. at 202. Accordingly, Thompson's motion for summary judgment based on qualified immunity must be granted.[10]

## B. First Amendment Retaliation Claim

Unlike plaintiffs' prior restraint claim, there is no doubt that the retaliation claim presents a live case or controversy. The sole question here concerns the merits of Thompson's motion for summary judgment on grounds of qualified

---

[9] It appears that the panel in *Crue* may have similarly misframed the clearly established analysis, *see* 370 F.3d at 680, however we have no occasion to offer any ruling on this point.

[10] Contrary to the district court's suggestion, the Supreme Court's decision in *NTEU* does not itself resolve the "clearly established" inquiry. That case involved a formal statutory ban prohibiting unconditionally the receipt of honoraria by *all* government employees. Such a sweeping legal enactment is clearly distinct from the kind of informal, internal directive at issue here.

immunity.

It is by now well established that the government may not arbitrarily silence the constitutionally-protected speech of its employees. Government workers do not forfeit their First Amendment rights simply by accepting pubic-sector employment. Claims of retaliation for exercise of First Amendment rights in the public employment context are evaluated through a now-familiar three-step analysis. "First, the court must determine whether the employee's speech was constitutionally protected under the *Connick- Pickering* test. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech." *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004).

In order to determine whether speech is constitutionally protected, we must engage in a two-part inquiry known as the "*Connick-Pickering* test." *Id*. (citing *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). "Under *Connick*, we must determine whether the speech addressed a matter of public concern. If the speech did involve such a concern, under the *Pickering* balancing test, we then must determine whether the government's interest as an employer in providing effective and efficient services outweighs the employee's interest as a citizen in commenting upon the matter of public concern." *Id*. at 698. "The determination of whether the speech is constitutionally protected is a question of law for the court." *Id*. (citing *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999)).

Here we need proceed no further than the *Connick* public concern inquiry. Plaintiffs have failed to demonstrate that they engaged in speech on a matter of public concern, and therefore Thompson is entitled to qualified immunity as

a matter of law.

There are three incidents of potentially protected speech at issue in this case: (1) Plaintiffs' November 2000 e-mails to Thompson requesting a meeting to discuss unspecified concerns about a rumored appointment, (2) Wernsing's January 2001 inquiry requesting clarification of the scope of Thompson's directives and (3) plaintiffs' meeting with Thompson in March 2001 where they articulated their specific concerns regarding Fuentes' possible appointment as Southern Bureau chief. Since the plaintiffs did not advance their speech at the March 2001 meeting as a basis for their retaliation claim before the district court, they have waived any argument based on this speech. *See Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 530 (7th Cir. 2005) ("We need not tarry over this argument; it was not presented to the district court and was, therefore, waived."); *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002) ("A party waives any argument that it does not raise before the district court . . . .") (internal quotations omitted).

That leaves plaintiffs' e-mails to Thompson and Wernsing's inquiry regarding the scope of Thompson's directive. Whether a government employee's speech addresses a matter of public concern depends upon "the content, form, and context of [the speech], as revealed by the whole record." *Connick*, 461 U.S. at 147-48; *see also Gustafson v. Jones*, 290 F.3d 895, 906-07 (7th Cir. 2002) (quoting *Connick*); *Ramirez*, 360 F.3d at 699 (same). Among these factors the content of the speech is the most important. *See Ramirez*, 360 F.3d at 699. To satisfy the public concern requirement, the speech in question "must relate to a community concern" and may not be "merely a personal grievance of interest only to the employee." *Id*. (internal quotations omitted).

### 1. Plaintiffs' e-mails

With respect to plaintiffs' e-mails, the district court ruled that, while the e-mails did not articulate any specific grievance or concern, they nonetheless constituted speech on a matter of public concern since "the speech involved an effort by employees to bring to light claims of actual mismanagement and gross negligence in the conduct of OIG business by Fuentes. . . ." 286 F. Supp. 2d at 994. The court explained that "[a]lthough the e-mails were vague and lacking in specific details, the text of the e-mails can reasonably be read to support Plaintiffs' asserted public purpose in speaking, as well as the contention that their complaints were motivated by considerations of public safety and the welfare of the mentally ill and developmentally disabled persons receiving DHS services who did not receive adequate protection during Fuentes' alleged mismanagement of the Southern Bureau." *Id.* Having determined that plaintiffs' e-mails fit the bill, the district court apparently did not reach the question whether Wernsing's inquiry qualified as speech on a matter of public concern as well.

This ruling was erroneous. Plaintiffs' e-mails cannot be considered speech on a matter of public concern for the simple reason that they articulate no particular viewpoint, grievance or complaint; they merely request a meeting with Thompson. In pressing their case, plaintiffs argue as if their concerns about Fuentes had actually been aired in the two e-mails. They had not. Regardless of whether the appointment of an incompetent director to the OIG Southern Bureau constitutes a matter of public concern,[11] we need not mire ourselves in hypotheticals

---

[11] Because we need not reach this issue, we decline to offer a definitive ruling on the substantive nature of plaintiffs' underly-

(continued...)

because plaintiffs' e-mails never broached this topic. They said only that they wanted to meet with Thompson to discuss unspecified "concerns" about a potential appointment in the OIG.

Apparently recognizing this fundamental difficulty, plaintiffs argue in their brief that the content "desired to be communicated" is a key consideration, and they ask us to focus our inquiry on the "*underlying* speech—the speech that the Plaintiffs *sought* to bring to defendant's attention by *means* of the e-mails." (Bingaman & Cannon Br. at 15 (emphasis in original).) They cite *Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir. 1994), for the proposition that "the *point* of the speech in question" is relevant to the public concern inquiry. *Id.* (emphasis in original). This line of argument is nonsensical. In their references to "underlying speech" that is "sought" to be expressed, plaintiffs are actually referring to speech which has not yet occurred, which, for First Amendment retaliation purposes, is no speech at all. This Court's precedents instruct that the *content* of the speech is the most important factor in determining the public concern element, *see Ramirez*, 360 F.3d at 699, not the inchoate intentions or views that the speaker privately holds.

We have previously held that otherwise unprotected speech does not suddenly attain protected status simply because it is animated by a viewpoint which, if actually expressed, might itself merit First Amendment protection. For example, in *Colburn v. Trustees of Indiana University*, 973 F.2d 581 (7th Cir. 1992), we ruled that university

---

[11] (...continued)
ing concerns. Aside from the fact that Article Three prohibits us from issuing advisory rulings, *see Lujan,* 504 U.S. at 560, the Supreme Court appears poised to consider a similar question in *Garcetti v. Ceballos*, which will be argued later this Fall, 125 S. Ct. 1395 (2005) (granting certiorari).

faculty members' request for external review of a faculty committee that made recommendations on professional advancement did not touch upon a matter of public concern, even though plaintiffs had claimed that the committee was biased against faculty members who had not joined the faculty union. *Id.* at 586. We noted that while speech relating to unionizing and collective activity may be a matter of public concern, the speech at issue—the request for an external review—failed to specify that this was the nature of the committee's bias.[12] *Id.* Similarly, in *Yoggerst v. Hedges*, 739 F.2d 293 (7th Cir. 1984), we ruled that an employee's expression of happiness upon hearing a rumor that the director of her office had been fired[13] was not speech that touched on a matter of public concern. *Id.* at 296. We explained that although the question whether the director was adequately qualified would constitute a matter of public concern, the plaintiff's bare statement of approval conveyed no information about the director's actual qualifications and would provide no basis for determining them. *Id.*[14]

---

[12] This lack of specificity was not the only basis for our ruling on the public concern issue in *Colburn*. We also noted that the plaintiffs were not attempting to inform the public about the matter—their primary motivation concerned their own standing within the university. *See* 973 F.2d at 586.

[13] Plaintiff merely asked a co-worker: "Did you hear the good news?"

[14] Our disposition here also finds support in *Connick* itself—the very font of the modern public concern analysis. The Court in *Connick* ruled that several internal survey questions circulated by the plaintiff did *not* touch on matters of public concern since "if released to the public, [the questions] would convey no information at all other than the fact that a single employee is upset with the status quo." 461 U.S. 138, 148 (1983). Similarly, plaintiffs' e-mails here contained no information that would have been useful
(continued...)

In the retaliation context, speakers simply may not invoke the protections of the First Amendment based on unexpressed viewpoints or unuttered thoughts. Government officials are not mind readers. The fact that members of the OIG wanted to meet with the Inspector General about the rumored appointment of an unspecified person does not, by itself, constitute a matter of concern to the public.

Perhaps recognizing that Thompson's psychic powers are limited, the plaintiffs next argue that Thompson should have attempted to ascertain the unspecified "concerns" that lay behind plaintiffs' cryptic e-mails; they assert that any uncertainty as to their viewpoints or motives was caused by Thompson's failure to follow up or investigate. The plaintiffs argue that *Waters v. Churchill*, 511 U.S. 661, 677-78 (1994), establishes a general "duty, before retaliating, to reasonably inquire as to the nature of the concerns which Plaintiffs asked to express." (Wernsing Br. at 29.) *Waters* stands for no such proposition. *Waters* holds that government supervisors must make a reasonable investigation into the content of the speech at issue and the identity of the relevant speakers before disciplining their employees for expressive activity. It articulates a factor that courts should consider in evaluating an employer's *response* to speech under the *Pickering* balancing test, and it helps to clarify "what should happen if the defendants hold an erroneous and unreasonable belief about what plaintiff said." *Id*. at 678.

Here, of course, there was no erroneous or unreasonable belief about what plaintiffs said—Thompson received the

---

[14] (...continued)
or noteworthy to the public at large, and if disseminated would reveal only that several OIG staff members sought a meeting with the Inspector General to air unspecified concerns about an unspecified appointment.

full text of both e-mails and correctly identified all the authors. More fundamentally, *Waters* and its progeny do not address the antecedent question whether the speech at issue, considered in its own right, addresses a matter of public concern, and it certainly does not enshrine any duty to investigate the possible meaning of a facially innocuous communication or random missive from an employee.[15] It would be unduly onerous to place a legal duty on government employers to ascertain whether employees who make vague requests for meetings might have something of public concern in mind.

## 2. Wernsing's Inquiry

This brings us to Wernsing's request for clarification of Thompson's directive—specifically, her inquiry as to whether the directive permitted her to discuss office business with her union representative, an attorney or a legislator. This act of "speech" meets the same fate as plaintiffs' e-mails. While it might be of mild interest to the public that Thompson had issued such a pre-clearance directive—and plaintiffs' briefs make a weak gesture in this direction—Wernsing clearly was not seeking to protest the directive, disseminate information or express any particular viewpoint about it. She was merely seeking clarification as to how the directive applied to her individually. The posture of Wernsing's inquiry is analogous to the internal questionnaire circulated by the plaintiff in *Connick*, who

> did not seek to inform the public that the District Attorney's office was not discharging its governmental

---

[15] The other cases cited by plaintiffs, *e.g.*, *Jefferson v. Ambroz*, 90 F.3d 1291, 1299 (7th Cir. 1996) (Rovner, J., concurring), similarly bear on the reasonableness of a supervisor's response to speech, not the public concern aspect of the speech itself.

> responsibilities in the investigation and prosecution of criminal cases. Nor did [the plaintiff] seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo.

461 U.S. at 148; *cf. Colburn*, 973 F.2d at 586-87 (request by faculty members for an independent review of a faculty evaluation committee did not raise a matter of public concern since, while "the public would be displeased to learn that faculty members at a public university were evaluating their colleagues based on personal biases," the request was "principally of importance to the few faculty members who had to tolerate the bickering").

Internal communications regarding office personnel policies, which allege no malfeasance or wrongdoing, simply are not the stuff of protected speech. Accordingly, Wernsing's inquiry does not constitute speech on a mater of public concern.

\* \* \*

Since the expressive activity underlying plaintiffs' retaliation claim does not constitute speech on a matter of public concern, we reverse the district court's ruling with respect to this claim. Thompson's motion for summary judgment on grounds of qualified immunity should have been granted.

## V. CONCLUSION

For the foregoing reasons, we REVERSE the ruling of the district court and REMAND this case with instructions to grant Thompson summary judgment with respect to all claims on grounds of qualified immunity.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*